Good morning, Lisa. We'll call the first case. 15-289 Isaac Coma v. Chicago Park District. Will both attorneys that are going to be arguing step up to the podium and identify yourselves for the record. Elliot Shipp on behalf of Isaac Coma. Good morning, Mr. Shipp. Fabian Gauna, G-A-U-N-A. Good morning, Mr. Gauna. Each of you will have approximately 15 minutes to present your argument from that, Mr. Shipp. You may save out some time for rebuttal. Okay, I will do so. May it please the Court, this case comes up on appeal on two issues. The first being whether or not 107A has any applicability here for total immunity to the Park District. And the question of whether or not it was willful and wanton as a matter of law that the Court could decide it. I want to address the latter part very briefly. The question became whether or not the conduct was another indifference to the condition. And when one looks at that, I thought the most pregnant thought that came out of the oral argument at the trial court level was the Court saying something to the effect of, well, if this had been six months that the gap had existed, then maybe I would consider, you know, using that that might make a difference. Well, what about three months? Isn't that really why those things are questions of fact as opposed to a determination as a matter of law? We can talk about that later, but I think that the focus where I can be of some benefit here is the application of 107A to some extent. Before we get off that utter indifference, I have one question. Sure. How is it utter indifference if, as soon as they receive a report, they immediately put it on their rapid response action plan? Isn't that contradicting the utter indifference? That's an excellent point. Well, thank you. But the key distinction to that is, and the cases have come out with that, is that if you make a decision, your goal to do so, that would be great. But here what we had was something that one of the parties said, one of the guys who was in charge of the rapid thing, said, I came in April, in the spring, in April of that year. The work wasn't done until July 13th of 2013. And during that period of time, when he did look at it, and when he said it was spring, and he did say it was April, although spring is March 20th. I looked that up on the Internet to see what spring is. But I said, well, in the spring of 2013. Okay, well, it's March 20th. Well, April. He said it needed to be done on an emergency basis. And they have a method for an emergency basis. So that goes back to the point of the using of the trial judge. Gee, okay, so it was April of 2013, and it got it done July. That's only, you know, two and a half, three months maybe. That's, you know, stretching it. Maybe if it was six months, maybe that would make a difference. So I agree with what the court is saying, that if somebody says, oh, we found a condition, we assigned it to a rapid response, and they send somebody out, and within some short period of time maybe the trial judge should be entitled to make that decision as a matter of law. I don't think that's the situation here. That's the only distinction I draw. And so the question becomes, are those the kind of cases that we say a trial judge should make the decision as opposed to a juror? That's basically the answer to the point. So I can talk more in detail about why it was dangerous, but it's their own testimony that two of them both agreed that it was dangerous. And that neither of them needed to. They also both indicated it was an emergency-type situation. Right, and they also said exactly correct. So looking at it just for the moment and talking about 107A and why it's applicable or not, I am struck by this because I drive down Lakeshore Drive every day, and I see today I happened to see the woman in one of these Mercedes-Benz strollers pushing a baby down the trail. And this is the golden jewel of Chicago. We've always enjoyed this trail. And I'm thinking if she had come across a culvert or a gap and she had gone flying over into the ground and the baby had gotten thrown out of the stroller, I don't know how they run and push a stroller, but they do this. Does she know that today in the appellate court the court is trying to decide, oh, they should be immune for that kind of situation? I want to ask you about 107A, though. Isn't Scott v. Rockford the only case that's dealing with 107A, and all the cases that you want to take a look at are 107B? That's partially correct. 107A is dealt with in the Goodwin case. It specifically speaks to 107A, but it was decided on 107B. So whether that's just musing of the appellate court or whether it's pertinent, I happen to think it's pertinent because it covers the very issues. It specifically speaks to 107A. And the problem with Scott, and since you brought that up, let me go to that point. It's interesting to note about Scott that when the court made the decision, the question that I wanted to address was in 107A it talks about the first part, road, and in 107B it talks about trail. Obviously the legislature knows that there's a difference between a road and a trail. And so if you keep that in mind when we look at the Scott case, what we do know is this. When I had an opportunity many, many, many, many years ago to be a clerk in the appellate court and look to see where we agreed on certain things, here's what a road was defined by the defendants here, and which we accept. It's at page 12 of their brief. They say a road is a wide way leading from one place to another, especially one with a specially prepared surface which vehicles can use. Now that's completely different than a trail. And this is the lakeshore trail that we're talking about. And so the definition that they use of what a road is and what a trail is are completely different. And if you looked at the vehicle code, which we cited in our brief, it also talks about what a roadway is for vehicular traffic. There's no question if anybody who's lived in Chicago as long as we all have, that that is maybe on occasion you'll see a police officer going through the park or something like that. But that's the rarity of all situations. Those things are for people who are running, people who are bicycling, people who are walking. 70,000 people, according to the record, are using that annually. So was it a road? And does 107A apply? So what happens in that Scott case, which is helpful for understanding that particular question, is that the court was asked about that in the appellate court. And what it said was, we noticed this. At the end of the opinion, it says, it was a road that is used for motorized travel. That's what it was. And then when the plaintiff in that case argued, well, wait a minute, is it a road which provides access? The court said, well, you've waived that argument to argue whether this is a road that he was bicycling on. And you may recall he was bicycling across a bridge. And this is a bridge for motorized traffic. And B, you forgot to raise it in the trial court, so we're considering it waived, although the court could have taken a waiver that only applies to it. The defense doesn't apply to the court, but the court dodged the question. So Scott doesn't really answer the question. And that's the point when you suggest, Justice O'Neill, that this is something – It's so confusing, believe me. Liberation is really difficult. So it's really quite different because nobody is going to confuse that bike trail, that pedestrian trail, as a motorized way. And if you also look at what it excludes, underneath the 107A, it says, except for those streets, highways, and let's say streets and highways and other highways by federal government. So the concept of what it's using when it says road, it's comparing it to – except for these things, those that are governed by or protected by streets or highways. So to say that the road becomes a trail, that just doesn't fit together. Why do they put that in the same paragraph? The other thing about this is that if you look at the Goodwin case, and I know they distinguish it, and you pointed out that, well, is this the only case that really talks about 107A, yes and no, yes and no. But if we look at 107A and what it said in the Goodwin case, it says you have to read 3-107 as a whole. And it indicates that the property referred to therein is unapproved, unimproved property. And it goes on to say, why are we granting absolute immunity to something like that? And they said, well, we're extending it for entry sustained on this type of property because the burden, time, and money of a local government entity would be required to maintain it. And they say the condition is just too much. But here, what do we have? We have a completely different situation. We have a system where the local government is, on an annual basis, and when somebody complains, coming in to repair it. They have a whole system for this. So it isn't the same situation that existed where you have a situation going to some forest preserver or some forest or something of that sort. So the language of the Goodwins doesn't limit it, even though it was decided on 107B, which is why I said I partially agree with what your comment was. But it talks about the justification of why are we giving absolute immunity here? Because you can't make them repair this sort of thing. Because it's a rural situation. It's for the enjoyment of recreational activities in a truly natural setting. We can't make a government be responsible for those kinds of situations if it was a road leading access to something. So it doesn't make, the absolute immunity doesn't make sense to use that in the basis of something that was used the way the trail was used here, the Lakeshore Trail. Is the, if we could move on to the Wilf-O-Montan part, or back to the Wilf-O-Montan for a moment. Sure. Are there any other reports of injury, or is the lack of any reports of injuries from this defect in the trail anything that we should be looking at in determining how negligent or whether it rises to Wilf-O-Montan? Well, what we do know of this, it was the only condition that year that was reported to need emergency care. The only one. And it was done in July. To answer your question, I have no knowledge one way or the other whether or not there were other injuries arising out of that. Was there one, was the only way this came to the attention of the Park District because of the gentleman who was doing his spring observations? Apparently, no. Apparently the call came in from a patron that complained it. But he also observed it. He also observed it. Once the patron made the complaint. Then he went out and looked. He went out and looked. He says he goes out and looks twice a year. Right. Goes back and forth twice, runs the whole trail. It's 18 and a half miles or something of that sort, all the way from way up north to way south. If you were actually going to suggest a case to us that would support that the actions here by the Park District showed an utter indifference, what case would you direct us to? Well, I think that there's. . . I mean, the cases all say it's generally a question of fact. That's. . . Possibly. Possibly. What case would you say best supports the idea that in this case the acts were at least. . . There's a question of fact that these acts or the lack of taking action, rather, for the six weeks or whatever it is, time frame, would support at least a jury question on utter indifference? The only way. . . I can't give you a case right at this very moment. I can tell you that every time I look at these cases about utter indifference, it seems to be one in which it's like a moving target of where one person thinks it's a willful and wanton and utter indifference and another takes a look at those facts and say it's not an utter indifference. And I've never been able to quite reconcile those cases. So I think that if I gave a case, I bet you that in all deference to my opposing counsel, he could give you a case that says, but here, you know. . . And that's why I go back to the musing of the judge because, well, if it was six months, I think I might say it was an utter indifference. I'm like, well, wait a minute. You don't get to decide that as a matter of law. That's why we have juries, you know. You say that six months is yes, it is, but three months it isn't. I just didn't really buy into that argument. But we're reviewing it de novo, so. Okay. I'd love to save some time for rebuttal if I could. Certainly. All right. Now we'll hear from opposing counsel. Your Honor. Good morning. Good morning, Justices. May it please the Court. I'm directly issuing this appeal on 316 and 317 of the Tort Immunity Act. I'm going to address 317 first in why the Lakeford Trail is absolutely immune from liability under this Act, where the trail is an access road that provides access to recreational and scenic areas, and secondly, in the alternative, why 316 immunizes the Park District from liability, where the facts in this case don't rise to the level of wolfing wants and conduct as required under this section. Looking at the language in 317, it states that a local public entity is not liable for injury caused by a condition of any road, which provides access to fishing, hunting, or primitive camping, recreational, or scenic areas. In interpreting this statute, we need to first look at the language in the statute. Aren't you trying to put primitive in the box just with camping and keep it out of the recreation and scenic area? That's correct, Justice. In looking at the plain language of the statute, the Supreme Court has said that the primary goal is to give effect and ascertain what the intent of the legislature is with respect to the language, and in doing so, they look at the plain language first. So if we look at the plain language first, we look at what the definition of road is. And under the Oxford Dictionary, it states, as counsel has stated, that a road is a wide lane leading from one place to another, especially one with a specially prepared surface which vehicles can use. Now, this piece... Is this trail along the lakefront? No, along the lakefront. No, I'm saying, are you saying it's a road? Yes, it's an access road. I read somewhere in the briefs where there's 60,000 people using it during the weekday. Do we have 60,000 people going to fishing or camping on that trail? Or is the trail itself the destination? No, the fact cited where 60,000 or 70,000 people use it, it's at peak season, right? The actual lakefront trail has a dual purpose. Let's say it's 15,000. 15,000. Do we have 15,000 going to fishing and camping on that trail? Whatever number it is, the trail itself has a dual purpose. It's recreational. It's... Recreation is allowed on the trail, but it also serves as an access road to the various recreational areas, scenic outlooks, and... Can't we say LaSalle Street is an access road to a recreational area? Of course. Because if you follow it, you'll eventually get there. Of course, Justice. And you can say that, but those would be excluded roads under 317A, where LaSalle Street would be considered a city, town, or village street, or it could be considered possibly a highway under the definition. But the plain language of a road is, as I stated under the dictionary definition, a wide way which is paved, leading from one place to another. And that's what the lakefront trail is. It allows... Why would they use the word trail in the same section of the statute and then use the word road? I mean, aren't you saying they're really the same thing? Well, no, because the case law has stated that a trail, under the plain meaning, is a marked path through a forest or mountainous region. Now, that would give effect to what these trails are traversing through, and the access road would necessarily be different. They would include two sections because a trail and an access road would either give access or, by their nature, are different. Isn't Scott v. Rockford the only case that has applied the absolute immunity outside of the forest preserve context? That's correct. And if you look at the majority of the cases that are cited... So wouldn't you consider Scott an outlier then? No, because Scott is giving the scope of 317A, whereas the rest of the cases deal with 317B. And if you look at the defendants in the majority of those cases where 317B is applied, they're Cook County Forest Preserve, the Forest Preserve of Lake County, King County Forest Preserve. Is there any case that says the Lake Front Trail has absolute immunity under 107? No, that issue has never come up. That is this one. Yes! That is this one. And, you know, for example, the Goodwin case dealt with a paved road inside of a city park. But the analysis there was that because it was a paved road within a city park, that it didn't fall within 317B. That was the extent of the analysis as to its applicability to that road. It didn't discuss whether 317A, for example, applied to that. What about the purpose of the statute? First of all, this statute says you have absolute immunity because this is in a remote area. I'm paraphrasing. It's in a remote area. So the purpose of it is you can't impose liability on a city to maintain this because we don't want it maintained. We want it in its natural state. Isn't that the purpose of 107? Well, this is for Goodwin or Pine. Now, I will sort of draw back to what I was stating earlier in that. Well, that sort of makes sense when you look at 3106 and 3107, that in 106 there isn't absolute immunity, but in 3107 there is. I mean, what was the reason for that? Well, these are all rules of statutory construction that are secondary to looking at the plain meaning. So when we're looking at the harmoniousness of 3106 and 3107, or if we're looking at inferring what the purpose of the legislative intent is in 3107B, if we're going directly to that, we don't want to overlook what the plain meaning of the words are. In the plain meaning of the words, the plain meaning analysis was done in Scott, and this wasn't done in Goodwin. I mean, even in Goodwin it stated that they distinguished themselves from Scott in saying, well, to the extent that there isn't any different than ours, it's because Scott analyzed 3107A, and we're dealing directly with 3107B. And, I mean, as a whole, the Total Immunity Act is meant to, as a general matter, it's necessary for the effective functioning of local governments. It's meant to prevent the dissipation of public funds to private damage awards, and I think that 3107B extends that to access roads and to trails and to give it to an absolute... 3106, I'm sorry? Yes. Yes. I mean, that's to recreational property. 3107B doesn't limit itself to recreational property. There's 3107... Recreational property that's really in its primitive state. No, I think that's what one or two of the cases opine about 3107B, especially when they looked at the plain meaning of trail. When you look at it and you see that there's no immunity, there's immunity, absolute immunity afforded under 3107, don't you think that's a reasonable interpretation of the statute? I mean, I think McElroy, the case McElroy v. Forest Preserve, they disagree, for example, that the trail has to be unimproved in order for immunity to apply. They said it could apply to different types of paths, whether they be paved, whether it could be gravel or limestone. I think the Brown case and I think the Moore case talked about paths that went through Forest Preserve, but they also were adjacent to a highway through developed areas. I mean, it doesn't have to be wholly, even under 3107B, it doesn't have to be wholly within a forested or wooded region 100% of the length of the trail. Mr. Gannon, before you run out of time, I'd like to get to Wolf Hall and Watkins. Sure. So they get a report in the spring and they have at best two months, at worst three, four months before it's repaired. Is that correct? No, that's not correct. The record shows them the deposition of Bill Greenaby, who was the project manager for the Park District. He stated that he received a phone call from the other employee, the other gentleman, Mr. Arlo, in June of 2013. Mr. Arlo, by his testimony, stated that once he received the phone call from the patron, he went out and looked to ensure that it was indeed a defect that was dangerous. And we don't know when this was? No, but he said that he took only a couple of weeks. There was no snow on that, which is a huge problem. No. It could mean anything, right? Yeah. But he stated that between the time that he fielded the phone call to when he inspected the area and he handed that information over to Mr. Arlo, it was only a couple of days. Mr. Greenaby, the project manager, by his testimony, stated that he recalls receiving this at around June of 2013. I think he had already traversed the length of the wait time channel, as stated in the record. Did both call in an emergency or just one? I'm sorry? Did both of those gentlemen call in an emergency or just one? No. The first gentleman, Mr. Arlo, did not call in. What about the other fellow? The other one, yes, he said that he called in an emergency or needed repair. So he called in an emergency and then was there any kind of barricade or anything else put up around the area? No, there was nothing put up, no sort of warrant signs or rebounds or anything like that. What was the sizes? The size of the – we don't know because there were no pictures of the actual defect. Only what it looked like repaired. And it was – So there's no information in the record regarding the approximate size of this? There were pictures of the repair book, of the location as it looks repaired. Did the plaintiff describe it? He described it just that it was large enough for his wheel to get stuck in it because he was trying to pass a pedestrian on their left side and in the median of the lakefront trail his wheel got stuck such that it stopped his bike and he fell over. So there is no description of the approximate size anywhere in the record? No, no. And so furthermore, there was no significant delay between the time that the park district discovered the defect. But isn't it whether you categorize it as a significant delay, isn't that a question of fact? What about counsel's argument that the judge was saying, well, maybe six months would be a significant delay, maybe three months? Aren't we at a – Well, I think the six-month comment was stated after the decision had been made and there was some discussion as to, well, what about this or what about that? Can't reasonable minds differ on what is a reasonable amount of time? Well, I think in this case there was no significant delay at all where the information was passed down through the internal channels. There were outside contractors that take care of these. So the other same best-case scenario is June that he gave out the rapid response, which was not so rapid, order, is that correct? The best-case scenario is that it took approximately a month when wheels were already in progress to take care of the lakefront trail repairs, that they added this as sort of an addendum towards the end of the inspection period because – So he categorized it as an emergency, but best-case scenario, this emergency defect was out there for a month. Well, the emergency comment, I think, was just his realization that it needed repair. Is there a category for emergency? Not necessarily because he's given – I think that the record and the testimony would affect that. Mr. Geary, he's the only – there's only one individual who makes all the inspections along the lakefront, and he's given a lot of leeway as to decide what needs repair and what doesn't need repair. What was the testimony regarding how quickly a rapid response action could take? Ms. Geary, who's the Deputy Director of the Capital Construction Program, states that on a yearly basis this whole process takes four to six weeks to – What's the rapid response? For the entire lakefront trail. What's regular response? Rapid response is a – What's regular response? Rapid response refers to a pool of outside contractors that are pre-qualified and that have done work for the park district in the past, and they can pass on the information knowing, you know, from the moment that they get the defect to getting the bids to the final scope of work to getting the boots on the ground and getting the people to repair, that it's going to take a lot quicker than going through normal channels where they have to go through. But they always have the option of barricades, don't they? That is – Is that what he testified to? Did he say that they could put up barricades? I think this is only in the cases where there were massive repair projects or massive emergencies. One of the testimonies from Rob Raymond stated that with particular attention, they look at the North Avenue and Oak Street areas because those are the areas that are closest to the lake and get hit the hardest during the wintertime by the waves. And there have been occasions where there have been entire sections that have been completely barricaded in order to make massive repairs. But when it comes to these sort of smaller repairs or things that fall within the scope of the yearly repairs that the Park District does on the lakefront, Mr. Dimity has given a lot of leeway to deciding whether or how this is going to get prepared or when he's going to do the inspection or which. But all those facts that you've just cited to us, doesn't that all beg the question, is this appropriate for summary judgment? These are all questions of fact. Well, the facts show that from the very beginning, from the moment that they received the phone call, that there was no delay, that they were in the process of repairing, of getting the information through the proper channels. This isn't like a standard as long as they make a notation that a repair needs to be done and they send it out to this non-rapid response team, that that's enough? Well, it wasn't just a notation. It was conversing with the contractors, showing them exactly where this needed to go, making sure that the final scope described the location and what needed to be done in those areas. I've seen the pictures of the repair. This isn't rapid science. They're not building something significant. They're filling in a jigsaw. Of course. And this is more in volume than in – this is a volume-based project where they need to scan these areas. Well, they need to scan the entirety of the 18-mile Lakefront Trail to make sure that they get every defect that needs repair to make sure that it's – Well, professor just stated this is the only repair that was designated as emergency. That's not true. This is the only one. Why was that dealt with first? No, that's not true. This – it was – But we've got a question of fact. No, we – he stated that this was the only emergency – or the only repair that was identified as an emergency repair basis. There was – as I stated, I think Mr. Raymond testified that specifically in that Oak Park, North Street area, that there was a number – I think in the previous fall, they had to completely cordon off the entire section because it was just completely unpassable because of the waves that had destroyed the Lakefront Trail along the lake. That was an emergency repair. That's what he identified as falls under the category of an emergency repair, something that is massive and something that is necessary to fix outside of that yearly, you know, 46-week Lakefront Trail repairs that they do on a yearly basis. Can I ask you to wrap it up? Sure. I think just based on looking at the plain language of 3107A, it's clear that the Lakefront Trail falls under the immunity, and I think in the alternative, the undisputed facts show that there was no significant delay. The park district took action, and because they were – they took affirmative steps to repair the defect, that they should be immune under 3106 as well. All right. Thank you. Brief. First, to answer the question you asked me while I was standing up here before, what case I might cite, I noticed that the one issue that always arises is if they had actual knowledge of the unsafe condition as opposed to they didn't discover the unsafe condition. Palmer v. Chicago Park District, 277, area 3, 282. It's at page 34 of our brief. To respond, Justice Burke was asking questions concerning what we have here. The testimony is it was 3 to 4 inches long, it was 2 to 3 inches deep, and it was 2 inches wide. The record you have before you, I just happen to disagree that he's misstating what the record is. I think that it shows that it was in April of 2013. There's two processes that go on. The first is if it's an emergency repair, and the only one that they've identified this whole year to answer the question that was asked by Justice House, that was the only one. And if it's a need of emergency repair, we have in-house people that do this repair. If it's not that kind of emergency, then they send it out for bid, and then they submit a bid, and then they give a deadline so they know how quick it was. They didn't do this on that particular basis. So in response to the comments that were being made by Justice Burke, that seems to me to present a question of fact. The third thing that the court was directing at is Justice McBride asked the question, well, what about 3-106? If you notice, 3-106 is always those situations where there is this policy of repairing, whereas the primitive recreational areas that are in forest preserves that we want in the natural condition that Goodwin, the First District Court, discusses says, look, it's in derogation of what is the common law. So we look at this very narrowly, but there is no rapid response. There is no repairs done in those primitive areas, in those wilderness areas, in those things. That's why 3-106 is so different than 3-107. And that's why Wilf and Wanton was carved out as an exception for partial immunity under that circumstance that you're immune from negligence. So for those reasons, 3-106 makes some sense, whereas 3-107 wouldn't have any application here because we have a system of repairing this. So it runs contrary to the very reason why we have this immunity, this complete immunity. And the trail is not that category because of the very nature of what they admit that they do. We go out there and repair it upon a customer complaint, and we start in the spring and we go up and down. They don't do that with any of the things in 3-107 that pertain to the areas that, as Justice McBride said, we want to keep it in its natural state. You go there as an access to it. And, by the way, I just happen to have a disagreement what that means when you say access to it because, as Justice Houser said, I mean, well, the South Street is an access. Access, I always thought was, you know, its purpose is to go from one spot to the other to gain access to something. The trail has its own purpose in and of itself. And that's what we see every single day if we drive down Lake Shore Drive. Thank you for your arguments. The matter was well-argued and well-briefed. We will take it under advisement. Thank you both. This is a positive case.